UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LARRY DARNELL COBB

                    Plaintiff,

        v.                                    Case No. 21-cv-424-pp

DR. JOSEPH MCLEAN, DR. DMITRIY CHESTER,
NURSE KATIE KROPIDLOWSKI,
NURSE JENNIFER VAUGHN, C.O. DAVID FIRKUS,
SERGEANT QUIANNA MCBRIDE,
KESHA PACKER, and UNIT MANAGER MS. FRY,

                    Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2) AND SCREENING COMPLAINT UNDER 28 U.S.C. §1915A**

        Larry Darnell Cobb, who was an inmate at the Milwaukee Secure

Detention Facility (MSDF) and is representing himself, filed a complaint under

42 U.S.C. §1983, alleging that the defendants failed to treat his epilepsy and

retaliated against him for complaining about his medical treatment and

conditions of confinement. This decision resolves the plaintiff's motion for leave

to proceed without prepaying the filing fee, dkt. no. 2, and screens his

complaint, dkt. no. 1.

**I.      Motion for Leave to Proceed without Prepaying the Filing Fee
        (Dkt. No. 2)**

        Because the plaintiff was not in prison when he filed his complaint, the

Prison Litigation Reform Act does not apply to this case. The court evaluates

1

the plaintiff's request to proceed without prepaying the filing fee under 28 U.S.C. §1915(a).

In the plaintiff's motion to proceed without prepaying the filing fee, the plaintiff says he is not employed and has no wages or salary. Dkt. No. 2 at 1–2. His only listed source of income is "Stimulus IRS—Relief," which the court infers are payments the federal government distributed as part of COVID-19 relief programs. Id. at 2. At the time of the motion, the plaintiff said he had received payments of $600 and $1,200, and a third payment of $1,400 was "pending." Id. The plaintiff says he has no monthly expenses and owns no property. Id. at 2–3. He "vow[s] to pay fee as soon as funds are available." Id. at 4.

The civil case filing fee is $402 (including a $52 administrative fee that plaintiffs proceeding *in forma pauperis* do not have to pay). The plaintiff's only stated source of income is the stimulus payments he has received (or expected to receive as of March 30, 2021). Although the plaintiff says he has no monthly expenses, the court concludes it would impose a significant financial hardship on the plaintiff to require him to use $402 of his stimulus payments to pay the filing fee. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee. He must pay the $350 filing fee over time as he is able.

**II.  Screening the Complaint**

    A.  <u>Federal Screening Standard</u>

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case

under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court liberally construes complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.    The Plaintiff's Allegations

The complaint alleges that on March 5, 2018, he was admitted to MSDF "under the mistaken identity Larry D. Gibson." Dkt. No. 1 at 1. The Milwaukee

3

County Jail allegedly sent the plaintiff to MSDF "with instructions in regards to his seizure disorder." Id. The complaint names Dr. Joseph McLean, Dr. Dmitriy Chester, Nurse Katie Kropidlowski, Nurse Jennifer Vaughn, correctional officer David Firkus, Sergeant Quianna McBride, complaint examiner Kesha Packer and unit manager Ms. Fry—all of whom are alleged to be employees at MSDF. Id.

The complaint alleges that Drs. Chester and McLean deprived the plaintiff of his epilepsy medication Levetiracetam for thirty days, from March 5 through April 5, 2018. Id. Without his medication, the plaintiff suffered "a severe seizure" on April 5, 2018. Id. at 1–2. The plaintiff allegedly "sustained a busted head wound that wouldn't stop bleeding and that had to be glued (repaired) at the hospital." Id. at 2. The plaintiff also reinjured his back and had to receive epidural injections for his pain, but they did not help. Id. The plaintiff says that before his seizure, he "had many mental and emotional breakdowns where staff had to step in and try to calm [him] down." Id. He says he experienced anger spells, suicidal thoughts, "extreme headaches" and difficulty breathing. Id.

The plaintiff alleges that Dr. Chester failed to provide his epilepsy medication from March 5 to April 5, 2018. Id. He alleges that on March 6, 2018, Chester time-stamped progress notes explaining that the plaintiff has "a seizure disorder/history," yet the plaintiff did not receive his medication. Id. He says Chester knew the plaintiff needed the mediation but failed to ensure he received it. Id. The plaintiff alleges that on December 14, 2016, before he was

4

admitted to MSDF, Chester signed a progress note noting that the plaintiff had had a seizure only three weeks earlier. Id. The plaintiff alleges he "was always given [his] seizure mediation" in other facilities. Id.

The plaintiff says he met with Dr. McLean only twice, the first time for a physical on March 9, 2018. Id. McLean discussed the plaintiff's seizure medication and noted that the medication would be sent to "the unit." Id. McLean even had the plaintiff fill out a proper medical authorization form correcting the "mistaken identity" and providing the plaintiff's correct name and prisoner identification number. Id. But the plaintiff still did not receive his medication. Id. He alleges that McLean "made no attempts to provide [him] with [his] seizure medication" even after discussing it with him and correcting his identification. Id.

The complaint alleges that on April 5, 2018, after thirty days without receiving his seizure medication, the plaintiff was "in bad shape," and spoke with Nurse Kropidlowski. Id. The plaintiff says she "immediately noticed" that his eyes were bloodshot, and he told her he had a bad headache and could not breathe. Id. Kropidlowski allegedly did not treat him, send him to doctors or take his vitals and instead told him "to go lie down for a while." Id. The plaintiff went back to his cell, was locked in and later suffered a seizure, causing his head injury. Id. He alleges that Kropidlowski could have prevented the seizure if she had provided him medical attention or sent him to see a doctor. Id.

The plaintiff alleges that on April 5, 2018, when he began to experience symptoms of a seizure, he pressed the emergency call button for help. Id. at 3.

5

Officer Firkus responded and asked what his medical emergency was. Id. The plaintiff said his head hurt and he could not breathe, but Firkus allegedly did not call for help and told the plaintiff "to fill out a blue slip which is a health service request form." Id. The plaintiff pressed the emergency call button again, but Firkus ignored the call and "left [the plaintiff] to suffer." Id. The plaintiff alleges he should have been rushed to the emergency room and provided medication though an IV. Id. He knows that is the proper procedure because that is how he was treated when he previously had a seizure while at his grandmother's house. Id. The plaintiff says Sergeant McBride "was in the bubble with Firkus and heard [his] cries for medical attention" but also failed to provide him medical help. Id. McBride eventually answered the plaintiff's calls for help through the intercom and said she would call a nurse, but she did not call for help and "just left [him] to suffer also." Id. The plaintiff alleges that Firkus and McBride refused to help him because the plaintiff complained that he was wrongly incarcerated and because he continuously pressed the button for emergency help. Id.

After the plaintiff suffered his seizure, Nurse Vaughn woke him. Id. He alleges she "looked scared" and that "[b]lood was everywhere." Id. Vaughn tried to apply pressure to the plaintiff's head wound, "but it didn't slow the bleeding." Id. She told the plaintiff to stay down. Id. Officer McCoy (who is not a defendant) called for help. Id. The plaintiff says that when paramedics arrived, Vaughn "acted unfairly when she waited for over 15-30 minutes before allowing the paramedics to transport [him] to the hospital." Id. The plaintiff alleges that

6

because he "was in such bad shape," Vaughn should have "allow[ed] the paramedics to take [him] to the hospital." <u>Id.</u> At the hospital, a nurse provided the plaintiff Levetiracetam through an IV, and a doctor closed his head wound. <u>Id.</u> at 3–4.

Once he was back at MSDF, staff moved the plaintiff from an upper bunk to a lower bunk. <u>Id.</u> at 4. He says no one gave him an ice pack for his back pain. <u>Id.</u> He alleges that over the next six months McBride harassed and retaliated against him to keep him from filing grievances about his seizure and injuries. <u>Id.</u> He alleges that on April 14, 2018, he was in observation after having a mental breakdown. <u>Id.</u> He alleges he "became extra vocal about Firkus and McBride . . . and made it clear [he] did not want to be around them." <u>Id.</u> He asked to move to another unit, but "[n]othing was done." <u>Id.</u> Two days later, unnamed staff moved the plaintiff to a mental health unit, where Firkus worked. <u>Id.</u> The plaintiff "[e]xpressed verbal dislike" for Firkus and McBride's alleged failure to help him during his seizure. <u>Id.</u> He says he "was rude, but not disrespectful." <u>Id.</u>

On April 20, 2018, unnamed staff placed the plaintiff on a lower tier, lower bunk restriction. <u>Id.</u> The plaintiff told McBride about his new restriction. <u>Id.</u> A week later, McBride "suddenly moved" the plaintiff from Firkus's unit to McBride's and placed him "in cell 19 as punishment." <u>Id.</u> The plaintiff explains that cell 19 "has a big brick wall in front of it whereas you cannot see out the cell window to see what time it is, know what day it, view the television, see people in the dayroom, so forth." <u>Id.</u> The plaintiff says his "mind couldn't deal

7

with that," and on May 9, 2018, staff moved the plaintiff to cell 23. Id. Cell 23 is "the last cell under [the] stairwell far to the back." Id. McBride moved an inmate named Troy Hart into cell 23 with the plaintiff. Id. The plaintiff says Hart "was severely sick and contagious" and "couldn't stop spitting up mucus everywhere in the room." Id. The plaintiff complained to McBride, who did nothing. Id. The plaintiff wrote to unit manager Ms. Fry, who did not respond. Id. The plaintiff eventually fell ill and asked to be moved to another cell. Id. McBride told him that he would grant the plaintiff's request if he "refuse[d] to lock back in to the cell." Id. The plaintiff complied, and McBride moved him to solitary confinement. Id.

On May 29, 2018, the plaintiff was released from solitary confinement and returned to McBride's unit. Id. at 5. McBride placed the plaintiff back in cell 23 with a cellmate named Richard Steinsal. Id. The plaintiff alleges he "was put on the floor in a boat for week(s) despite there being other rooms available." Id. Steinsal had an infection "and was urinating blood which was always on the floor and toilet where [the plaintiff] had to sleep." Id. The plaintiff and his new cellmate complained about the conditions to McBride. Id. A nurse treating Steinsal asked him to urinate in a cup but then left the housing unit without treating him, "leaving him stuck with the cup of blood." Id. The plaintiff alleges he and Steinsal told McBride and correctional officer McWilliams (who is not a defendant) about the conditions in their cell. Id. The officers merely responded that the bloody urine "isn't sitting around us" and sent the men back to their

cell. Id. The plaintiff says he "felt afraid, deprived, humiliated and mistreated." Id.

On June 11, 2018, the plaintiff returned to the cell where he had suffered the seizure on April 5, 2018. Id. He says being housed there caused him to "relive the experience over and over." Id. He alleges that McBride played loud music over the intercom and kept the plaintiff locked in his cell when he had visitors, reducing their visit time from thirty minutes to ten minutes. Id. The plaintiff complained about his reduced visitor time and was moved back to cell 19 (he does not say who moved him), where he previously had difficulty living. Id. The plaintiff alleges that on June 26, 2018, McBride removed the plaintiff's lower bunk restriction because she knew the plaintiff was at a risk being on the top bunk. Id. The plaintiff says he "suffered episodes" in cell 19 and was moved to an observation cell for monitoring. Id. On July 2, 2018, the plaintiff was released from observation and again returned to McBride's unit, where McBride sent him to cell 19 "as punishment for complaining." Id. The plaintiff alleges that McBride put the plaintiff on the top bunk again to "punish [him] by inflicting psychological pain and stress." Id. On July 12, 2018, the plaintiff again "suffered episodes" while in cell 19. Id. When McBride was not working, unspecified staff moved the plaintiff from cell 19 to a lower bunk in cell 13 "per doctor's' [sic] order/restriction." Id. When McBride returned to MSDF, she "immediately moved [him] back to cell 19 as punishment and was clearly upset that staff properly moved [him] to cell 13 low bunk." Id.

On September 10, 2018, the plaintiff was placed back on observation status. Id. The next day, he once again returned to McBride's unit and was placed in cell 1, where there is a brick wall similar to the one in cell 19. Id. Unspecified staff moved a new cellmate into the cell with the plaintiff. Id. The cellmate did not have a name tag and the plaintiff does not know his identity. Id. The plaintiff alleges the cellmate told him "he was an ex sergeant from Fox Lake Prison who was convicted for raping inmates." Id. The plaintiff says he did not sleep for days and felt unsafe. Id. He complained to McBride and asked to be moved. Id. at 5–6. He says that when he explained the situation to McBride, she reacted "as if [she] already knew that." Id. at 6.

On October 4, 2018, McBride moved the plaintiff into cell 15, where the water did not work. Id. The plaintiff told McBride and other unspecified staff, but no one fixed the water. Id. When the plaintiff left MSDF on October 12, 2018, the water still was not working. Id. An unknown officer (who is not a defendant) allegedly violated prison policy to provide the plaintiff drinking water outside of the facility because he had none inside the cell. Id. The plaintiff says that he attempted to learn the name of the officer or the maintenance worker who turned off the water, but no one provided him that information. Id. He alleges that McBride refused to provide him water in cell 15 to punish him for continuing to complain about his treatment on April 5, 2018, the day he suffered his seizure at MSDF. Id.

The plaintiff alleges that MSDF complaint examiner Kesha Packer "overlooked [his] need for help when [he] wrote her complaining" about his

10

treatment. Id. He alleges that Packer "disregarded" and failed to investigate his complaints and instead "searched for ways to deny [him] access to the [complaint] system." Id. He alleges that he "was given improper or outdated forms" to use, and then Packer rejected the complaints because they were on old forms. Id. The plaintiff alleges that Packer otherwise denied his complaints because they "were against her friend McBride and other coworkers she was friendly with." Id. He says she also denied him help because he was on the mental health unit, where inmates "were left abused, neglected, deprived of medical help, and mental health treatment." Id.

The plaintiff alleges that unit manager Fry "failed to step in on a unit she was responsible for managing." Id. at 7. He says she failed to respond to letters and complaints he sent her about his mistreatment, remove him from McBride's unit or question McBride about her alleged harassment of the plaintiff. Id. He alleges that Fry never "conducted a welfare check on [him] and left [him] suffering on her unit." Id. She also did not respond to his requests for a lower bunk or to be moved from the cells he shared with sick inmates. Id.

The plaintiff seeks actual and punitive damages "in an unspecified amount." Id. He asks the court "to include and attach to its findings of Deliberate Indifference Wisconsin State Law that governs negligence." Id. The plaintiff also "want[s] to see some change and do not want this behavior by the defendants to occur again to patients/prisoners held at [MSDF]." Id. He requests that MSDF implement mandatory daily inspections and/or welfare checks on all incarcerated persons on the mental health unit and document

the results of those checks. Id. He wants MSDF staff to prepare treatment plans for all incarcerated persons on the mental health unit "that's designed to provide immediate help to the patient/prisoner." Id.

C.    Analysis

The complaint raises several potential claims against the defendants. The court will address each, categorized by the law under which the plaintiff seeks to proceed.

1.    *Eighth Amendment*

The complaint alleges that two doctors failed to provide the plaintiff his seizure medication, which led him to suffer a seizure. He says that two nurses failed to provide him proper treatment immediately before or after his seizure. The court analyzes these allegations under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To state a valid Eighth Amendment claim, the inmate must allege both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)); see Estelle, 429 U.S. at 103.

12

"[D]eliberate indifference describes a state of mind more blameworthy than negligence." Farmer, 511 U.S. at 835. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez, 792 F.3d at 776 (citing Farmer, 511 U.S. at 837). Neither negligence nor gross negligence is enough to support an Eighth Amendment claim. See Farmer, 511 U.S. at 835–36; Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001).

A delay in treating the plaintiff's medical condition, even if it was not life threatening, "may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." Arnett v. Webster, 658 F.3d 742, 753 (7th Cir. 2011) (citing McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010)). The more serious the condition, and the easier it is to treat it, the less of a delay the plaintiff must show to demonstrate that the defendant violated his rights. Id. (citing McGowan, 612 F.3d at 640). In certain circumstances, "even brief, unexplained delays in treatment may constitute deliberate indifference." Lewis v. McLean, 864 F.3d 556, 563 (7th Cir. 2017) (quotation omitted).

The plaintiff alleges that he has epilepsy and takes medication so he will not suffer seizures. He alleges that Drs. Chester and McLean were aware of his epilepsy and each discussed his condition with him on at least one occasion. He says that neither doctor provided him his medication, and that without the medication he suffered emotional distress, mental breakdowns and eventually a seizure that caused him physical injury requiring hospitalization. The

13

plaintiff has satisfied the objective element; epilepsy is an objectively serious medical condition for purposes of an Eighth Amendment claim, especially when the patient is not receiving medication to treat it. See Reed v. McBride, 178 F.3d 849, 853 (7th Cir. 1999) (citing Hudson v. McHugh, 148 F.3d 859, 863 (7th Cir. 1998)) ("We have also held that unmedicated epilepsy posed a 'serious threat' to a prisoner's health."). The plaintiff also has satisfied the subjective element by alleging that both doctors were aware of his epilepsy but failed to provide him medication to control it. Accepting these allegations as true at the pleading stage, the court concludes that the plaintiff has stated an Eighth Amendment claim of deliberate indifference against Drs. Chester and McLean. He may proceed on this claim against the doctors.

The plaintiff also asserts that the nurses were deliberately indifferent to his epilepsy. He says that on April 5, 2018, shortly before suffering his seizure, he spoke with Nurse Kropidlowski. She noticed the plaintiff's eyes were bloodshot, and he told her his head hurt and he was having trouble breathing. Kropidlowski did not send the plaintiff to a doctor, take his vitals or provide treatment but instead told the plaintiff to lie down. But the plaintiff does not allege that Kropidlowski was aware of his epilepsy or risk for seizures. He alleges only that she knew what symptoms he reported—bloodshot eyes, a headache and trouble breathing. Even if Kropidlowski could have done more at the time, the plaintiff's allegations do not suggest that she was aware of "a substantial risk of serious harm to" him and "then disregard[ed] that risk." Perez, 792 F.3d at 776. The allegations instead suggest that Kropidlowski

14

wrongly judged the seriousness of the situation. That is not the same as being aware of and disregarding the plaintiff's epilepsy. See Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662 (7th Cir. 2016) ("[W]ithout more, a mistake in professional judgment cannot be deliberate indifference."). At most, Kropidlowski was negligent (perhaps grossly negligent), which does not violate the Constitution. The court will not allow the plaintiff to proceed on an Eighth Amendment claim against Kropidlowski.

The plaintiff alleges that Nurse Vaughn treated the plaintiff immediately after his seizure and injury. She attempted to stop the plaintiff's bleeding and told him not to try and stand. The plaintiff alleges, however, that she did not allow the paramedics transport the plaintiff to the hospital for fifteen to thirty minutes. He alleges that this delay in treatment violated his Eighth Amendment rights. But he does not allege that the delay worsened his condition or furthered his injury. Because she treated the plaintiff's head wound immediately after his seizure, the court cannot classify Vaughn's actions as indifferent. Although Vaughn was aware of the plaintiff's injuries, his allegations suggest she was trying to help and did not disregard his condition. The plaintiff alleges that Vaughn "acted unfairly" and should have allowed the paramedics to take him sooner. Dkt. No. 1 at 3. As with his allegations against Nurse Kropidlowski, these allegations suggest that Vaughn may have been negligent. They do not suggest she was deliberately indifferent to the plaintiff's medical condition. The court will not allow the plaintiff to proceed on an Eighth Amendment claim against Vaughn.

15

The plaintiff next alleges that Officer Firkus and Sergeant McBride failed to properly respond to his seizure and provide him immediate emergency treatment. The court also analyzes these allegations under the Eighth Amendment. See Estelle, 429 U.S. at 104. As with his claims against the medical professionals, the plaintiff must allege both that he "is incarcerated under conditions posing a substantial risk of serious harm" and that the officers had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. As noted, that means the officers must have been more than negligent; they must have recognized that the plaintiff faced "a substantial risk of serious harm" and disregarded that risk. Perez, 792 F.3d at 776.

The plaintiff says he pressed the emergency call button in his cell when he experienced symptoms of a seizure. Firkus and McBride answered, and he told them he could not breathe and needed immediate attention. Neither officer called for help nor sent a medical professional to the plaintiff's cell. Firkus allegedly told the plaintiff to fill out a request for health services. Dkt. No. 1 at 3. McBride told the plaintiff she would call a nurse to help him, but she did not. The plaintiff alleges that the officers declined to call a nurse because they were angry at him for complaining about his incarceration and for repeatedly pressing the emergency call button. Id. Although the officers are not medical professionals, and the plaintiff does not allege that he told them he had been off his epilepsy medication, the plaintiff alleges he told the officers he could not breathe and needed immediate medical help. But they failed to provide any help at all. These allegations satisfy both elements of an Eighth Amendment

16

claim of deliberate indifference against Firkus and McBride. The court will allow the plaintiff to proceed against them on this claim.

The plaintiff alleges that Packer intentionally rejected his inmate complaints about his treatment before and after his seizure and failed to investigate his complaints against McBride and other staff. Incarcerated persons do not have a substantive right to file grievances, "so the alleged mishandling of [an incarcerated person's] grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim." Owens v. Hinsley, 635 F.3d 950, 953 (7th Cir. 2011) (citations omitted). But the plaintiff may have an Eighth Amendment claim of deliberate indifference against Packer if she failed to do her job, leaving him "to face risks that could be averted by faithful implementation of the grievance machinery." Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009); see Mason v. Berres, No. 19-cv-1103-pp, 2021 WL 50882, at *3 (E.D. Wis. Jan. 6, 2021) (allowing prisoner plaintiff to proceed on a claim that complaint examiners "failed to meaningfully investigate his complaints" and "summarily rejected his complaints without reviewing them"), reconsideration denied sub nom. Mason v. Clover, 2021 WL 424159 (E.D. Wis. Feb. 8, 2021).

The plaintiff's allegations imply the latter. He alleges that Packer not only denied his grievances but did so intentionally and without first investigating his allegations. He says she denied his complaints, not on their merits, but because they were submitted on outdated forms (the only ones to which he had access) or because they were asserted against McBride and other staff with

17

whom Packer "was friendly." Dkt. No. 1 at 6. These are not allegations that the plaintiff disagreed with a complaint examiner who was just doing her job; they are allegations that a complaint examiner *refused* to do her job properly and disregarded the plaintiff's complaints. The court will allow the plaintiff to proceed on this Eighth Amendment claim against Packer.

Finally, the plaintiff alleges that Fry failed to protect the plaintiff from McBride, provide the plaintiff a safe cell on her unit and address the plaintiff's physical and mental health issues. As with the plaintiff's claim against Firkus and McBride, the court reviews these allegations as a claim of deliberate indifference under the Eighth Amendment. See Farmer, 511 U.S. at 832-33 (noting that prison officials "must take reasonable measures to guarantee the safety of the inmates" (quotations omitted)). The plaintiff must allege that Fry was subjectively aware of an excessive risk of harm to his health or safety and disregarded that risk. Id. at 837; see Perez, 792 F.3d at 776. But a prison official does not violate an inmate's right if she fails "to alleviate a significant risk that [s]he should have perceived but did not." Farmer, 511 U.S. at 838.

The complaint does not allege that Fry was personally responsible for the conditions of the plaintiff's confinement. It seeks to hold her liable in her role as a unit manager. But under §1983, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates." Iqbal, 556 U.S. at 676. The plaintiff instead must explain how "each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id.; see Day v. Subsecretario del Sistema Penitenciario Federal,

838 F. App'x 192, 193 (7th Cir. 2021) ("Supervisors are responsible for what they do themselves, not for what their subordinates do."). A supervisory official, like a unit manager, may be liable for the actions of her subordinate, like a sergeant, only if she knew about the alleged conduct and facilitated, approved, or condoned it or "turn[ed] a blind eye for fear of what [she] might see." Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001).

The complaint does not establish that Fry was aware of the plaintiff's treatment on the unit she managed. It does not allege facts suggesting that Fry was aware of the conditions the plaintiff faced and approved, condoned or ignored them. The plaintiff alleges that Fry did not respond to his letters or complaints. But he does not allege that Fry ever *received* the letters or complaints he sent to her and does not say whether he spoke with her in person or whether she was otherwise aware of the conditions he faced. He assumes she knew about everything happening on the unit because she is the unit manager. But that assumption is not enough to establish her liability under §1983 or the Eighth Amendment. See Iqbal, 556 U.S. at 676; Farmer, 511 U.S. at 838. The plaintiff has not satisfied the subjective element of an Eighth Amendment claim and has not stated a claim against Fry. The court will dismiss Fry and the claim against her.

2. *First Amendment*

The court analyzes the plaintiff's allegation that McBride retaliated against him under the First Amendment. See Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009). To state a claim of retaliation, the plaintiff must allege that

19

"he engaged in a protected activity, he suffered a deprivation likely to prevent future protected activities, and there was a causal connection between the two." <u>Felton v. Huibregtse</u>, 525 F. App'x 484, 486 (7th Cir. 2013) (citing <u>Watkins v. Kasper</u>, 599 F.3d 791, 794 (7th Cir. 2010); and <u>Bridges</u>, 557 F.3d at 546).

The plaintiff alleges that over a time span of six months, McBride moved him into undesirable prison cells that caused him to suffer mental distress and breakdowns, housed him with sick and contagious cellmates who spread their illnesses to him and denied his medical restriction for a lower bunk. He alleges that McBride did so after the plaintiff returned from the hospital and complained about McBride's response to the plaintiff's request for emergency treatment shortly before he suffered his seizure. Raising concerns about safety or other prison conditions is a "constitutionally protected activity." <u>Daugherty v. Page</u>, 906 F.3d 606, 610 (7th Cir. 2018). Being housed in the conditions the plaintiff describes and having his medical restriction denied "would likely deter a person of ordinary firmness from continuing to engage in protected activity." <u>Douglas v. Reeves</u>, 964 F.3d 643, 646 (7th Cir. 2020) (quotation omitted). The standard for that second element is objective, so the plaintiff's "persistence" in filing grievances and complaints about his conditions of confinement "does not undermine his claim." <u>Id.</u> (citing <u>Holleman v. Zatecky</u>, 951 F.3d 873, 880 (7th Cir. 2020)). The plaintiff's allegations satisfy the three elements of a First Amendment claim of retaliation against McBride. The court will allow him to proceed on this claim.

###### 3.    *State Law Claims*

The plaintiff does not say who he believes acted negligently towards him. Although the plaintiff does not state an Eighth Amendment claim against Nurses Kropidlowski and Vaughn, he may have a state law claim of negligence against the nurses. A district court may exercise supplemental jurisdiction over state law claims that "are so related to claims in the action" over which the court has "original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §1367(a). The proposed state law claims allege that Nurses Kropidlowski and Vaughn negligently failed to treat the plaintiff immediately before and after his seizure. The factual basis for these claims overlaps with the factual basis for the plaintiff's proceeding federal claims. See Sheppard v. Bowens, No. 21-cv-127, 2021 WL 1171705, at *3 (E.D. Wis. Mar. 28, 2021) (quoting Birdo v. Mathis, No. 15-cv-456, 2015 WL 3948150, at *3 (S.D. Ill. June 26, 2015)) (explaining that it is appropriate for a court to exercise supplemental jurisdiction over related state law claims when "'the proof necessary for the state claim overlaps with the proof necessary for the federal claim.'"). The court will exercise its supplemental jurisdiction and allow the plaintiff to proceed on the state law claims, as well.

## III.    Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **DISMISSES** Unit Manager Ms. Fry.

Under an informal service agreement between the Wisconsin Department of Justice and the court, the court will electronically transmit a copy of the complaint and this order to the Wisconsin Department of Justice for service on defendants Joseph McLean, Dmitriy Chester, Katie Kropidlowski, Jennifer Vaughn, David Firkus, Quianna McBride, and Kesha Packer. Under the informal service agreement, the court **ORDERS** those defendants to respond to the complaint within 60 days.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for completing discovery and completing dispositive motions.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[1] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are not in prison or are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

>Office of the Clerk
>United States District Court
>Eastern District of Wisconsin
>362 United States Courthouse
>517 E. Wisconsin Avenue
>Milwaukee, Wisconsin 53202

---

[1] The Prisoner E-Filing Program is mandatory for all persons incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution and Oshkosh Correctional Institution.

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. The plaintiff's failure to keep the court advised of his address may result in the court dismissing the case without further notice for failure to comply with court instructions and diligently prosecute this case.

The court will include a guide prepared by court staff to address common questions that arise in cases filed by prisoners. Entitled "Answers to Prisoner Litigants' Common Questions," this guide contains information that the plaintiff may find useful in prosecuting his case.

Dated in Milwaukee, Wisconsin this 26th day of August, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

23